UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:    3/9/22
```

United States of America,

   –v–

Julia Greenberg,

      Defendant.

21-CR-92 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

The Government filed a one-count superseding indictment against six Defendants, including Julia Greenberg. Greenberg now moves to dismiss the indictment due to outrageous government conduct, to dismiss the indictment as duplicitous, to sever Greenberg's trial from the other five Defendants, to dismiss the indictment for failure to allege a crime, to suppress her statements allegedly obtained in violation of the Fifth Amendment, and to produce minutes of the grand jury proceedings to her or for *in camera* inspection. For the reasons that follow, the Court DENIES Greenberg's motion.

## I.  Background

Generally, in evaluating a motion to dismiss, the Court "accept[s] as true all of the allegations of the indictment." *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). The Court first recites the facts as drawn from the superseding indictment filed February 18, 2021. S1 Indictment, Dkt. No. 12. Greenberg's motions to dismiss for outrageous government conduct and to suppress her post-arrest statements, however, necessarily implicate facts beyond the confines of the superseding indictment and, in resolving those issues, the Court is permitted to consider facts extrinsic to the indictment. *See United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991); *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997).

**A.  Facts alleged in the superseding indictment**

The superseding indictment alleges a conspiracy to commit immigration fraud by preparing and submitting false asylum claims.  Generally, to obtain asylum, applicants must show that they have suffered persecution in their country of origin on account of race, religion, nationality, political opinion, or membership in a particular social group, or have a well-founded fear of persecution if they were to return to their country.  S1 Indictment ¶ 10.[1]  An asylum applicant must complete Form I-589 and present it to U.S. Citizenship and Immigration Services.  *Id.* ¶ 11.[2]  Because Form I-589 asks for a detailed account of the applicant's asylum claim, applicants often attach to it an asylum affidavit that provides more detail about their background and the basis for their claim.  *Id.*  If another individual, like an attorney, prepares Form I-589 for the applicant, then that preparer must provide her name and address.  *Id.*  Both the applicant and the preparer must sign Form I-589 under penalty of perjury.  *Id.*

After Form I-589 is submitted, the applicant is interviewed by an Asylum Officer to determine if the applicant is eligible for asylum.  *Id.* ¶ 12.  The applicant may speak, under oath, on her own behalf at the interview and may present witnesses or additional documentation to substantiate her claim.  *Id.*  The Asylum Officer then determines the applicant's eligibility.  *Id.*  If the applicant is deemed eligible, she receives a completed Form I-94, which demonstrates that she was granted asylum and permits the applicant to pursue other relief like permanent resident status.  *Id.* ¶ 13.  If the applicant is deemed ineligible, her application is referred to an Immigration Judge who holds a hearing to determine the applicant's eligibility.  *Id.* ¶ 14.  If the

---

[1] *See generally* 8 U.S.C. § 1158 (primary asylum statute); *id.* § 1101(a)(42) (defining "refugee"); 8 C.F.R. § 1208.1 *et seq.* (primary asylum regulations); *United States v. Dumitru*, 991 F.3d 427, 430 (2d Cir. 2021) (per curiam), *cert. denied*, 142 S. Ct. 831 (2022).

[2] *See Liang v. Garland*, 10 F.4th 106, 109 n.2 (2d Cir. 2021).

2

Immigration Judge also denies the applicant, the applicant may appeal to the Board of Immigration Appeals and, if still unsuccessful, to the U.S. Court of Appeals.  *Id.* ¶ 14.

Russian America is a company that assists its clients, primarily noncitizens from Russia, Ukraine, and nearby countries, in seeking asylum, visas, citizenship, and other forms of legal status in the United States.  S1 Indictment ¶ 1.  Defendants Yury Mosha and Uladzimir Danskoi operated Russian America, Mosha from an office in Manhattan and Danskoi from an office in Brooklyn.  *Id.*  The indictment alleges that Mosha and Danskoi advised Russian America clients to obtain asylum by false claims, knowing they did not qualify for asylum.  *Id.* ¶ 2.  According to the indictment, in advising these false asylum claimants, Mosha and Danskoi conspired with Defendants Julia Greenberg, Tymur Shcherbyna, and Kateryna Lysyuchenko, who knowingly assisted with the clients' fraudulent asylum claims and helped them prepare and submit asylum applications and affidavits to USCIS.  *Id.*  Greenberg is a licensed immigration attorney.  *Id.* ¶ 7. In the alleged scheme, she prepared applicants that she knew would lie to USCIS officers to obtain asylum and she accompanied these applicants to their USCIS interviews, during which she and the applicant made statements that she knew were false.  *Id.*

The superseding indictment identifies three cooperating witnesses that acted as clients of Russian America.  The first of these is CS-1, a Ukrainian national, who in April 2019 started a blog critical of the Ukrainian government, "at Mosha's instruction, to generate a basis to seek asylum."  *Id.* ¶¶ 3–4, 20.  Mosha submitted CS-1's Form I-589, which claimed that CS-1 authored the blog posts when Mosha knew that the blog was in fact written by Defendant Shcherbyna, who Mosha introduced to CS-1.  *Id.* ¶ 20.  CS-1's Form I-589 also recounted an incident when CS-1 was assaulted in Ukraine because he spoke Russian, though Mosha understood that this incident did not occur.  *Id.*  Greenberg in September 2019 "knowingly

3

prepared and coached CS-1 to lie under oath to a USCIS Asylum Officer, understanding that CS-1 would convey false information about" why he started the blog, who wrote the blog, and the persecution he faced in Ukraine.  *Id.*

The second cooperating witness, CS-2, met with Defendant Aleksei Kmit, who told CS-2 that Russian America had already prepared his Form I-589 on the basis of a blog that CS-2 had not yet written.  *Id.*  The superseding indictment does not allege that Greenberg ever interacted with CS-2 or that Russian America ever submitted CS-2's Form I-589 to USCIS.

The third cooperating witness, CS-3, met with Danskoi in Brooklyn.  *Id.*  Danskoi assisted CS-3 in preparing a Form I-589 on the basis of CS-3's sexual orientation while knowing that CS-3 was a heterosexual male who did not face persecution.  *Id.*[3]  CS-3 was further assisted in preparing his application by Defendant Lysyuchenko.  *Id.*  Danskoi referred CS-3 to Greenberg, knowing she would prepare CS-3 to lie in his interview.  *Id.* ¶ 9.  In December 2020, Greenberg met with CS-3 and helped prepare him for his interview with a USCIS Asylum Officer, knowing that CS-3 would falsely claim persecution based on his sexual orientation.  *Id.* ¶ 20.  Greenberg further instructed CS-3 to appear and dress in a manner that comported with the expected appearance of a gay man.  *Id.*

### B.  Relevant facts extrinsic to the superseding indictment

The Court draws the following facts, which reflect only a portion of the Government's investigation, from representations in the parties' briefing and the exhibits attached to Greenberg's motion.  Where the parties differ, the Court accepts as true the allegations proffered by Greenberg.  An evidentiary hearing is therefore unnecessary.  *See United States v. LaPorta,*

---

[3] "Persecution on account of sexual orientation has been recognized by the Attorney General as a protected ground under the 'particular social group' category of the definition of a refugee." *Morett v. Gonzales,* 190 F. App'x 47, 48 (2d Cir. 2006) (citing *Matter of Toboso-Alfonso,* 20 I. & N. Dec. 819, 822 (BIA 1990)).

46 F.3d 152, 160 (2d Cir. 1994); *United States v. Davis*, 57 F. Supp. 3d 363, 364 n.1 (S.D.N.Y.

2014) ("Because the Court accepts as true all of the facts proffered by the Defendants, and

nonetheless finds that the Government's alleged conduct does not render the indictment

constitutionally defective, a hearing need not be held.").[4]

### 1. CS-1, CS-2, and Mosha

The Federal Bureau of Investigation on February 18, 2018, received an anonymous tip

that Russian America, and Mosha specifically, was committing immigration fraud. Greenberg

Br., Ex. A, Dkt. No. 115. The FBI engaged CS-1 to meet with Mosha and tell him that CS-1

wanted asylum to stay in the United States and not return to Ukraine. Greenberg Br. at 4.[5]  On

August 14, 2018, CS-1 met with Mosha, who stated that he and Russian America "do not take

any fictious cases." *Id.*, Ex. C at 3. He then "suggest[ed] that [CS-1] start his own blog about

the situation in the Ukraine," that Mosha would help promote it, and that CS-1 "pay six thousand

[dollars] for the whole case including a lawyer." *Id.* at 3, 5. As Mosha explained, by "writing a

blog," CS-1 "will be proving that [he] will be persecuted in the future because they kill bloggers

and journalists there for real." *Id.* at 3. He continued: "But it has to be done, you have to work

on it, not just for the asylum sake, see? Because your officer will understand if you are not that

knowledgeable about the subject, politics, etc." *Id.* at 4.

CS-1 met Mosha again on August 23, 2018, and expressed his lack of direction and

unfamiliarity in writing a blog on websites like Live Journal. *Id.*, Ex. D at 5–9. Mosha told CS-

1 that he will "have to prove" to the Asylum Officer that he "came to the blog [himself], and it

[was his] decision and [he was] not doing it just for a green card," to which CS-1 affirmed, "I

---

[4] Greenberg does not request an evidentiary hearing on any issue raised in her motion.

[5] Greenberg emphasizes that CS-1 was previously convicted of drug trafficking, conspiracy to commit bank fraud, and aggravated identity theft. Greenberg Br. at 4–5; *see also* Ex. B at 7.

can't say that . . . [Mosha] said to make a blog" and that "it is my decision, of course."  *Id.* at 12–

13.  During this conversation, CS-1 also asked about whether he could choose the lawyer with

whom he would work.  Mosha said that "they are all good," and that the "function of a lawyer is

to check the story, to add some kind of information, and that's their whole function for a case.

That is, she doesn't go to the interview with you."  *Id.* at 11.  CS-1 reiterated that this application

was important to him, and Mosha stated he "will give it to [him]."  *Id.*  But, Mosha said, CS-1

did not need to be in touch with a lawyer "right now."  *Id.* at 15.

On September 11, 2018, CS-1 and Mosha again met and CS-1 expressed difficulty in

writing the blog.  *Id.*, Ex. F at 4.  Mosha responded that he could "give [CS-1] a guy" that works

in Ukraine that CS-1 would pay "like $50 or $100 a month."  *Id.*  Mosha explained that the guy,

later identified as Defendant Shcherbyna, would "be doing this with [CS-1]," would "discuss this

with [CS-1]," and for "additional money . . . can help [CS-1] with technical aspects."  *Id.*  CS-1

again agreed that the blog had to be his own.  *Id.* at 5.  Then, following from their prior

conversation about an attorney, CS-1 told Mosha that he had "read" and "like[d] this Julia

[Greenberg]."  *Id.* at 8.  Mosha said that she was busy with, "like[,] everyone else."  *Id.*  In his

later report to the FBI, CS-1 said that Mosha said Greenberg was near the Mexican border with

another client at the time.  *Id.*, Ex. E at 2.[6]  Mosha then referred to another, unnamed attorney,

who also had a "heavy load" of "many clients," but that "[i]f she will have free time, then we'll

call her next week.  She'll understand."  *Id.*, Ex. F at 8.

On October 11, 2018, CS-1 spoke with Mosha, first asking about how he could pay

Mosha.  *Id.*, Ex. G at 2–3.  CS-1 then told Mosha that he was paying Shcherbyna "$40 per week"

and that Shcherbyna "is doing one post per day," which CS-1 "really like[d]."  *Id.* at 3.  CS-1

---

[6] As Greenberg notes, this information is not contained in the transcript of Mosha and CS-1's
conversation.  Greenberg Br. at 6.

continued: "I was just saying that I thought that it would just be some writing and that's it.  But he is really like *NBC News*, in short.  In other words, there are photos on there, documents, thoughts, analysis."  *Id.*  Mosha responded that this was "especially good" and to "[l]et it be like this."  *Id.* at 3–4.  CS-1 then asked about an attorney, to which Mosha said they would "do a meeting with an attorney . . . when the attorney confirms the story."  *Id.* at 4.

On November 19, 2018, CS-1 spoke with Lysyuchenko, who was recommended to CS-1 by Mosha to assist with CS-1's asylum affidavit.  According to the Government, Mosha had told Lysyuchenko that CS-1 had never been persecuted in Ukraine and that someone else was writing his blog.  Gov't Br. at 7, Dkt. No. 126.  CS-1 expressed that he had "no time at all to write [his] history" and that he "really [has] nothing to write about."  *Id.*, Ex. H at 1 ("I told you that the last time.").  Lysyuchenko responded: "I am not allowed to write the history.  I can correct it for you. . . . .  I just don't know anything about you.  I can't write it like that."  *Id.*  After CS-1 again said that he had told Mosha he had "no history of being pursued," Lysyuchenko stated that she "can't write the story.  That's totally forbidden by law."  *Id.* 2.  When CS-1 offered to "pay [her] extra money," Lysyuchenko again said it was "forbidden by law" for her to write the affidavit.  *Id.*  Finally, Lysyuchenko agreed to write a "plan" for a statement and agreed to accept "additional payment" for doing so.  *Id.* at 3.

After receiving the plan, CS-1 asked Lysyuchenko if he could simply insert his name into it.  Greenberg Br. at 7.  Lysyuchenko said this would be illegal.  *Id.*  In a February 22, 2019 phone call, Lysyuchenko said that CS-1's affidavit would be sent to "the lawyer to check," but that the draft of his affidavit did not "really strongly show" a real fear of persecution needed for asylum.  *Id.*, Ex. I at 1–2.  CS-1 asked if the lawyer would "fill in this picture in such a way that . . . we are discussing now," to which Lysyuchenko said "*No*, she doesn't . . . fill in" but instead

writes "comments." *Id.* at 2.   Lysyuchenko asked if the lawyer knew the affidavit was "a product of [his] imagination," to which Lysyuchenko said that was "for [CS-1] to discuss with Aleksey.  I don't know what it says in the terms of your contract." *Id.*; *see also id.* at 3 (CS-1 referring to him and Lysyuchenko "invent[ing] everything possible").

The Government on February 15, 2019, asked the FBI to send another cooperating witness, CS-2, to Mosha. *Id.*, Ex. J at 9.  CS-1 on June 17, 2019, introduced CS-2 to Mosha, and asked that Mosha introduce CS-2 to Shcherbyna.  Greenberg Br. at 8.  Mosha told CS-2 that his case for asylum must be real. *Id.*  Without CS-1, CS-2 met with Mosha on December 1, 2019, and asked how he could fabricate an asylum case and whether he could use someone else's address in his application.  Greenberg Br. at 8.  Mosha told CS-2 that these actions were illegal and that he should tell only the truth. *Id.*  On December 11, 2019, Russian America terminated its agreement with CS-2 and refunded his payment. *Id.* at 9.

On July 30, 2019, CS-1 and Mosha discussed the answers that CS-1 should give in his upcoming interview. *E.g.*, *id.*, Ex. K at 2–5.  CS-1 told Mosha he had "stopped reading" the posts in his blog "because there are many of them," to which Mosha responded that he should read "5–6 topics." *Id.* at 5.  Mosha then told CS-1 that he "[doesn't] need a lawyer at the interview" and that "[a] lawyer doesn't do anything." *Id.* at 5–6.  Mosha then relented to CS-1's request for a lawyer, telling CS-1 that while Greenberg "is on vacation," he would "ask around if anybody is able to go." *Id.* at 6; *see also* Greenberg Br. at 8 & n.5.  CS-1 told the FBI that Mosha stated that Greenberg was his "usual attorney" for asylum interviews but that she was on vacation. *Id.*, Ex. L at 2.[7]

---

[7] Greenberg correctly notes that this statement is not in the transcript of the conversation supplied by the Government.  Greenberg Br. at 8.

After CS-1 rescheduled his interview, with the Government's assistance, Greenberg returned from vacation and Mosha asked her to appear at CS-1's interview.  Greenberg Br. at 8. Greenberg agreed to represent CS-1 at the interview for $1,500.  *Id.*, Ex. M at 3.

Greenberg met with CS-1 along with an interpreter on September 5, 2019, immediately before his asylum interview.  Greenberg told CS-1 that she had read CS-1's affidavit but had not spoken with Mosha about it.  *Id.*, Ex. N at 2.  She also clarified that her role was to "only speak at the end," not to tell "the officer not to ask a certain question" or to stop CS-1 from saying "anything stupid."  *Id.*  Over the course of their conversation, CS-1 told Greenberg that he did not write the blog but that another "person wrote the blog for [him]," a person that Mosha "referred."  *Id.* at 3; *see also id.* at 6 ("I did not write it at all.  Another person is writing it. . . . But in reality, I don't even read it, let alone write it.").  He also explained that he had changed the details of an assault that he allegedly suffered in Ukraine after Mosha had told him that prior versions of the story were "not suitable."  *Id.* at 2–6 ("I rewrote this backstory five times."). Greenberg asked CS-1 for additional details, including what injuries he had sustained and why he had not gone to a hospital.  *Id.* at 5–6.  Later in the discussion, in which Greenberg asked CS-1 questions that the Asylum Officer was likely to ask, CS-1 described the alleged assault in significant detail and also went into greater depth his reasons for starting the blog, including that he was "really angry over the level of theft and corruption . . . in Ukraine."  *Id.* at 19–22 ("Not because Yuriy Mosha said so.").

CS-1's asylum interview was recorded.  At the end, the Asylum Officer noted that he had "credibility concerns" and asked if Greenberg would "address that a little bit."  *Id.* at 23.  In response, Greenberg referred back to CS-1's story of the assault at a bar that he alleged occurred

because he spoke Russian. *Id.* at 24–27.  After they exited the interview, CS-1 paid Greenberg $1,000.  *Id.* at 28.

USCIS denied CS-1's asylum application and placed CS-1 into removal proceedings—though he was not in fact eligible for removal—to be overseen by an Immigration Judge in New York.  Greenberg Br. at 12; Gov't Br. at 10.  Greenberg agreed to represent CS-1 in these proceedings for an additional $6,000 retainer.  Gov't Br. at 10–11.  A short scheduling hearing was held before the Immigration Judge, without the Judge's knowledge of the FBI's investigation or that CS-1 was not a genuine asylum applicant, at which Greenberg represented CS-1.  *Id.* at 11; Greenberg Br. at 12–13.  An official from the Office of the Principal Legal Advisor represented to the Immigration Judge that CS-1 was a removable immigrant.  Greenberg Br. at 13.  A formal immigration hearing was scheduled for November 6, 2023.  Gov't Br. at 11.

### 2. CS-3 and Danskoi

CS-3 first met with Danskoi in Russian America's Brooklyn office in August 2019.  Greenberg Br. at 13.[8]  In that initial conversation, Danskoi suggested different bases on which CS-3 could seek asylum, including for his political opinions.  *Id.*  In a later conversation, CS-3 paid Danskoi $1,500 to prepare and file his asylum application, *id.*, and Danskoi referred CS-3 to Lysyuchenko, *id.*, Ex. O at 2.  Danskoi told CS-3 that CS-3 "should not tell [Lysuchenko] directly that, 'You know, make everything up for me,'" to which CS-3 responded, "No, I won't."  *Id.* at 7.

The FBI directed CS-3 to seek asylum as a gay man.  *Id.*, Ex. J. at 9.  Danskoi told CS-3 that asylum based on sexual orientation was "the most important one" of the bases they had

---

[8] CS-3 had previously pled guilty to unlawful possession of a firearm and the FBI agreed to facilitate CS-3's efforts to obtain a green card in exchange for his assistance.  Greenberg Br. at 13.

discussed because Asylum Officers "don't even ask for proof, for the analysis of the evidence," as they do for a claim based on political opinion. *Id.*, Ex. P at 1. CS-3 "sarcastically" told Danskoi that he "is clearly not gay." *Id.* at 3. Danskoi told CS-3 to ask Lysyuchenko for examples of asylum affidavits on the basis of sexual orientation, and Danskoi then told CS-3 that he should "[m]aybe wear an earring to the interview." *Id.* at 4.

CS-3 on December 27, 2019, told Danskoi that he wanted to hire a lawyer for an additional fee. Greenberg Br. at 14. Danskoi told him that it was not necessary because an attorney could only observe the interview, but that he would find CS-3 a lawyer if CS-3 really wanted one. *Id.* On January 29, 2020, Danskoi again told CS-3 that he "shouldn't worry about an attorney at this point." *Id.* at 15.

On March 18, 2020, the Government requested that CS-3 be scheduled for an asylum interview to see if he would be assigned an attorney. *Id.*, Ex. Q at 3. Once the interview was scheduled, Danskoi gave Greenberg's phone number to CS-3 and CS-3 called Greenberg to schedule a consultation. Greenberg Br. at 15. During the November 20, 2020 consultation, when Greenberg asked if CS-3 applied for asylum on the basis of sexual orientation, CS-3 said "it's that way according to the story," laughed, and then said, "I wouldn't want that, but he says it's better this way," to which Greenberg said, "Yes." *Id.*, Ex. R at 3. CS-3 asked Greenberg if he should "wear different clothes," and Greenberg said, "Absolutely." *Id.* at 4. Greenberg later told CS-3 that she "wouldn't advise going back" to Ukraine," to which CS-3 said "I won't go there. I'd better not go there at all." *Id.* at 5. CS-3 then asked Greenberg if he will "pass." *Id.* at 7. Greenberg said that, "[t]o tell you the truth, um, you don't . . . you don't look like [UI] gay." *Id.* at 7–8. CS-3 responded, "Yes, I understand." *Id.* at 8. During this consultation, CS-3 did not directly state that he was not gay.

Greenberg and CS-3 met again on December 9, 2020, in advance of CS-3's interview scheduled for December 22, 2020.  *Id.*, Ex. S.  Greenberg asked CS-3 a series of questions based on his asylum affidavit.  When Greenberg asked about an injury that CS-3 sustained while wrestling in college, CS-3 said that "I didn't do wrestling. . . . [S]he wrote it like that.  I thought, 'Well, [UI]' Katya came up with that."  *Id.* at 3.  Near the end of their discussion, Geenberg told CS-3 that she "wanted to tell [him] that both me and the *officer* . . . we roughly understand when a person is lying to us. . . .  [T]herefore, there are no *gays* who are embarrassed by their, um— *being gay* . . . .  There are no *gays* who can't describe their feelings when they found out about it for the first time, how they were scared by it . . . ."  *Id.* at 18 (italics in original).  CS-3 said that "[e]verything will be fine."  *Id.*  He continued that he would "buy clothing before the interview," to which Greenberg responded that he "absolutely must have a scarf" and "must have shoes of some unusual . . . color."  *Id.* at 19; *see also id.* at 20 ("We'll pluck the eyebrows and do a manicure.").

### 3.  Greenberg's post-arrest statement

Greenberg was arrested by armed federal officers early on February 18, 2021, in Colorado, where she and her family, including two of her three children, were on vacation.  Greenberg Br. at 17.  The officers arrested Greenberg, placed her in handcuffs, and drove her for approximately 2.5 hours to the U.S. courthouse in Denver.  *Id.* at 18.  The conversation in the car was recorded.  Before a *Miranda* warning was given, Agent Danielle Deboer briefly encouraged Greenberg to cooperate and to "think of [her] future with [her] kids, with [her] husband."  Recording at 2:04–3:20.  Deboer then administered the *Miranda* warning and Greenberg waived her rights both orally and in writing.  Greenberg Br. at 18, Gov't Br. at 50.  Greenberg proceeded

to make a series of potentially inculpatory statements over the remainder of the recording, which spans 2 hours and 9 minutes.

### C.  Procedural history

A grand jury returned an indictment, dated February 11, 2021, charging Defendants with one count of conspiracy to commit immigration fraud in violation of 18 U.S.C. § 1546(a) and 18 U.S.C. § 371.  Dkt. No. 3.  The superseding indictment was filed February 18, 2021.  Dkt. No. 12.  Greenberg filed this motion on October 15, 2021.  Dkt. No. 114.  The Government filed its response on November 12, 2021, Dkt. No. 126, and Greenberg filed a reply on November 26, 2021, Greenberg Reply, Dkt. No. 127.  Greenberg filed a notice of supplemental authority on February 11, 2022.  Dkt. No. 136.  A jury trial is tentatively scheduled for June 13, 2022.  *See* Dkt. No. 131.

The Court on February 4, 2022, ordered the Government to produce to the Court a flash drive containing the audio recording of Greenberg's post-arrest statement made to law enforcement.  Dkt. No. 135.  The Court received the recording on February 7, 2022.

## II.    Legal standard

Because "federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (cleaned up).  However, "[a] defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged."  *United States v. Post*, 950 F. Supp. 2d 519, 527 (S.D.N.Y. 2013) (cleaned up) (quoting Fed. R. Crim. P. 7(c)(1)); *see also United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014); *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013)

13

(explaining that "an indictment need do little more than to track the language of the statute

charged and state the time and place (in approximate terms) of the alleged crime" (cleaned up)).

Generally, "[a] court should not look beyond the face of the indictment and draw

inferences as to proof to be adduced at trial, for 'the sufficiency of the evidence is not

appropriately addressed on a pretrial motion to dismiss an indictment.'" *United States v. Scully*,

108 F. Supp. 3d 59, 116–17 (E.D.N.Y. 2015) (quoting *United States v. Alfonso*, 143 F.3d 772,

776–77 (2d Cir. 1998)).  That is, "although a judge may dismiss a civil complaint pretrial for

insufficient evidence, a judge generally cannot do the same for a federal criminal indictment."

*United States v. Sampson*, 898 F.3d 270, 280 (2d Cir. 2018).  To be clear, this rule does not apply

to every claim that a defendant can raise in a pretrial motion.  "Judges can, of course, make

factual determinations in matters that do not implicate the general issue of a defendant's guilt,

such as motions to suppress evidence, selective prosecution objections, and objections

concerning discovery.  But when a defense raises a factual dispute that is inextricably

intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule

12(b) motion."  *Id.* at 281 (citing Fed. R. Crim P. 12(b), 12(b)(3)(A), 12(b)(3)(C), 12(b)(3)(E),

and 12(d)).  "The Government is entitled to marshal and present its evidence at trial, and the

defendant is entitled to challenge the sufficiency of that evidence pursuant to Rule 29 of the

Federal Rules of Criminal Procedure."  *United States v. Kelly*, 462 F. Supp. 3d 191, 197

(E.D.N.Y. 2020) (citing *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992)).[9]

---

[9] The Second Circuit has acknowledged an "extraordinarily narrow" exception to this general
rule that permits the Court to consider the sufficiency of the evidence in a pretrial motion when
"'the government has made what can fairly be described as a full proffer of the evidence it
intends to present at trial.'"  *Sampson*, 898 F.3d at 282 (quoting *Alfonso*, 143 F.3d at 776).  But
the Court does not follow that exception here.  First, Greenberg has not invoked it.  Second, the
Government cannot fairly be said to have made such a full proffer, as it neither submitted a
sworn affidavit nor made a "detailed presentation of the entirety of the evidence" to the Court as
would be required.  *Id.* at 282–83 (citing *Alfonso*, 143 F.3d at 777, and *United States v. Mennuti*,
639 F.2d 107, 108 & n.1 (2d Cir. 1981)).  And third, the Second Circuit has expressed serious

### III.    Discussion

Greenberg raises three distinct arguments for dismissal of the indictment against her. First, that the indictment must be dismissed under the outrageous-government-conduct doctrine. Second, that the single count is duplicitous because it inappropriately combines two distinct conspiracies. And third, that the indictment, for several reasons, fails to allege a crime.

In the absence of total dismissal, or in addition to partial dismissal, Greenberg seeks three additional forms of relief. First, she asks that she be severed from the five other Defendants charged in the superseding indictment because their charges are legally and factually distinct. Second, she seeks to suppress post-arrest statements that she made to law enforcement. Last, she requests the production of the minutes of the grand jury proceedings for her own review or for *in camera* review by the Court.

### A.  Motion to dismiss for outrageous government conduct

### 1.  Applicable law

The Supreme Court and Second Circuit have long observed that "Government involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped." *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (citing *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999); *United States v. Russell*, 411 U.S. 423, 431–32 (1973)).[10] "To

_____

doubts about the exception's constitutionality and its continued vitality in light of intervening decisions of the Supreme Court. *See id.* at 281, 282 n.10 (citing *Kaley v. United States*, 571 U.S. 320 (2014)).

[10] This doctrine differs from that of entrapment in at least two important respects. First, entrapment "focuses on the defendant's predisposition" while the outrageous-government-conduct doctrine "focuses on the conduct of the government agents." *Al Kassar*, 660 F.3d at 121. Second, unlike an entrapment defense presented at trial, "[a] motion to dismiss an indictment on account of outrageous government conduct is directed to the court rather than

15

establish a due process violation on this ground, a defendant must show that the government's conduct is 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction.'" *Id.* (quoting *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)). Generally, for conduct to be "outrageous," "the government's involvement in a crime must involve either coercion or a violation of the defendant's person." *Id.* It is not enough that "the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive"; nor is it enough that the government employed "feigned friendship, cash inducement, and coaching in how to commit the crime." *Id.* (citing *Schmidt*, 105 F.3d at 91; and *United States v. Myers*, 692 F.2d 823, 837–39 (2d Cir. 1982)).

The defendant carries the burden of proof. *United States v. Nunez–Rios*, 622 F.2d 1093, 1098 (2d Cir. 1980). That burden is "very heavy" because of courts' "well-established deference to the Government's choice of investigatory methods." *Al Kassar*, 660 F.3d at 121 (quoting *Rahman*, 189 F.3d at 131). Consequently, the Second Circuit has rarely, if ever, held that a government investigation met this high bar. *United States v. Heyward*, No. 10-CR-84 (LTS), 2010 WL 4484642, at *3 (S.D.N.Y. Nov. 9, 2010) ("[T]he Second Circuit has yet to identify a particular set of circumstances in which government investigative conduct was so egregious that it shocked the conscience and violated fundamental guarantees of due process."); *United States v. Gomez*, 83 F. Supp. 3d 489, 492 (S.D.N.Y. 2014) (explaining that the Second Circuit "has never found a violation of due process based on the government's outrageous conduct" (citing *Schmidt*, 105 F.3d at 91)); *United States v. Cromitie*, 781 F. Supp. 2d 211, 222–23 (S.D.N.Y.

---

jury." *Regan*, 103 F.3d at 1082. Thus, a defendant may prove a defense of entrapment without proving outrageous government conduct and vice versa. *Cuervelo*, 949 F.2d at 565.

2011), *aff'd*, 727 F.3d 194 (2d Cir. 2013) (identifying *United States v. Twigg*, 588 F.2d 373 (3d

Cir. 1978), as the only circuit case in which an outrageous-government-conduct claim

prevailed).[11]

### 2. Analysis

Greenberg identifies four aspects of the Government's conduct here that, she says,

constituted outrageous conduct warranting dismissal of the indictment.  First, she claims that the

Government "manufactured" the alleged fraud, pointing to a number of statements in which the

Defendants, for example, insisted that they take only genuine asylum claims, refused to fabricate

stories for the cooperating witnesses, and, in the case of CS-2, terminated their representation

once CS-2's intent to file a false asylum claim became clear.  Greenberg Br. at 23–25.  Second,

Greenberg argues that the FBI improperly used other government entities, notably including the

Immigration Court without its knowledge, to further its investigation.  *Id.* a 26–27.  Third, she

states that the Government's investigation preyed on her duty of loyalty to her clients, making

her an unknowing participant to fraud.  *Id.* at 27–29.  And fourth, Greenberg argues that the

Government violated due process by obtaining her statements in CS-1's and CS-3's civil asylum

proceedings.  *Id.* at 29–30.

The Court addresses first Greenberg's argument that the fraud was manufactured because

the Defendants expressly refused to engage in fraud.  As an initial matter, this argument rests on

Greenberg's own interpretation of the incomplete record presented, an interpretation that differs

markedly from the Government's reading of these transcripts.  It is not the Court's role to now

decide whether there is sufficient evidence of the Defendants' intent to conspire to commit

---

[11] Greenberg disputes whether the Second Circuit has ever found a violation of the outrageous-government-conduct doctrine, citing dicta in *United States v. Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973).  Greenberg Reply at 24.  Regardless, it is indisputable that any such case is "rare." *Schmidt*, 105 F.3d at 91.

immigration fraud.  *See Sampson*, 898 F.3d at 280.  But the Court concludes that, at this time,

Greenberg has not demonstrated that the crimes alleged were merely the product of the

Government's "own imagination" and "deceit and trickery."  Greenberg Br. at 23–24 (citing

*United States v. Gardner*, 658 F. Supp. 1573, 1577 (W.D. Pa. 1987) (finding outrageous conduct

where the government agent "persisted over a period of time in inducing and p[e]rsuading the

Defendant to commit the crime in question with [the] sole motive and intention of overcoming

the obvious reluctance of the Defendant")).  Greenberg notes, for example, that in Mosha's first

meeting with CS-1, Mosha repeatedly stated that he and Russian America "do not take any

fictious cases."  Greenberg Br., Ex. C at 3.  Yet an individual does not have to orally admit to

having a fraudulent intent to be guilty of fraud.  In that same conversation, Mosha suggested that

CS-1 write a blog so that he could develop a basis for asylum.  *Id.* at 3–4.  When CS-1 later

expressed difficulties writing the blog, Mosha referred CS-1 to Shcherbyna.  To be sure, Mosha

said that CS-1's monthly payments to Shcherbyna were only so that Shcherbyna would "discuss"

writing a blog with CS-1.  *Id.*, Ex. F at 5.  But just one month later, when CS-1 told Mosha that

Shcherbyna was writing "one post per day," Mosha responded that it was "especially good" and

that CS-1 should "[l]et it be like this."  *Id.*, Ex. G at 3–4.

 As to CS-3, Danskoi said that it would be illegal for Danskoi to arrange a sham marriage

for CS-3.  Greenberg Br. at 25.  And, as Greenberg quotes, Danskoi told CS-3 not to tell

Lysychenko, "make everything up for me."  *Id.* (quoting Ex. O at 7).  But Danskoi's comments

immediately following that statement can reasonably be understood as a suggestion that CS-3

nevertheless should be less than truthful in his asylum affidavit:  "Well, I am not urging you to

make something up, or lie, but you, if you have some relation to it, you should try to describe it .

. . how you feel about it."  Ex. O at 7.  Moreover, in later conversations, Danskoi noted that one

feature of seeking asylum on the basis of sexual orientation is that the Asylum Officer allegedly won't "even ask for proof." *Id.*, Ex. P. at 1.  Upon consideration of both the specific instances identified by Greenberg, and consideration of the available record as a whole, the Court does not find that the cooperating witnesses' requests to Mosha and Danskoi manufactured the Defendants' alleged fraud or constituted outrageous behavior by the Government.  *Accord Myers*, 692 F.2d at 843 ("Due process challenges to an undercover agent's encouragement have been rejected when one defendant was solicited twenty times before committing an offense . . . ."); *Cromitie*, 781 F. Supp. 2d at 222–23 (government agent "spent a half a year or more trying to persuade [the defendant] to go forward with a jihadist mission, but there was no coercion of any sort, no suggestion of duress and no physical deprivation"); *Gomez*, 83 F. Supp. 3d at 493 ("[T]he Second Circuit has repeatedly stated that government encouragement, even if extensive, does not amount to outrageous conduct unless it rises to the level of coercion or physical force . . . .").[12]

Next, as to Greenberg's argument that the FBI improperly used USCIS and the Immigration Court in its investigation, the Court finds that this claim, too, does not justify dismissal of the indictment.  The Second Circuit has previously upheld even more elaborate sting operations.  For example, in *Schmidt*, government agents "posed as hit men, accepted a prisoner's solicitation to murder two government agents during an escape, and then conducted a

---

[12] Greenberg notes at several points that CS-1 and CS-3 were compensated by the Government for cooperating in the investigation, including that the Government would assist CS-3 in obtaining lawful status in the United States.  *E.g.*, Greenberg Br. at 24.  But while compensation to undercover informants may be a valid basis for impeachment at trial, even substantial compensation is not a basis for dismissal of charges.  *See, e.g.*, *United States v. Myers*, 527 F. Supp. 1206, 1240 (E.D.N.Y. 1981), *aff'd*, 692 F.2d 823 (2d Cir. 1982) (informant was paid approximately $250,000 for undercover operation).

fabricated prison breakout." *United States v. Davis*, 57 F. Supp. 3d 363, 366–68 (S.D.N.Y. 2014) (citing *Schmidt*, 105 F.3d at 91–92). That the FBI here arranged two asylum interviews for fictitious applicants is not more outrageous than the conduct in *Schmidt*. Nor was it a violation of due process for CS-1's case to go before an Immigration Judge in what Greenberg describes as a short "calendar hearing." Greenberg Br. at 12. Simply put, this aspect of the FBI's investigation was not "'so repugnant and excessive' as to shock the conscience." *United States v. Duggan*, 743 F.2d 59, 84 (2d Cir. 1984) (quoting *United States v. Romano*, 706 F.2d 370, 372 (2d Cir. 1983)).

Third, that Greenberg was retained as CS-1's and CS-3's attorney, meaning that Greenberg owed them a duty of loyalty, does not render the Government's investigation outrageous. Greenberg's briefing is not entirely clear on this point. The Court understands Greenberg's argument to be that once Greenberg allegedly learned that CS-1's and CS-3's claims for asylum were fraudulent, she owed a "legal obligation of zealous advocacy and unconflicted loyalty to" them as clients, which included a duty "to protect CS3 and his privileged information." Greenberg Br. at 28. To the extent Greenberg argues she had an obligation to represent CS-1 and CS-3 even after she learned their claims were fraudulent, the Court rejects that argument. "For example, Rule 1.2(d) [of the Model Rules of Professional Conduct] prohibits attorneys from advising clients to commit fraudulent or criminal acts." *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 756 (5th Cir. 2008); *see also* Model Rules of Pro. Conduct r. 3.3(b) ("A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."). Similarly, the otherwise-inviolable attorney-client privilege gives way where the

communications made between an attorney and her client were "made for the purpose of getting advice for the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563 (1989) (cleaned up); *Clark v. United States*, 289 U.S. 1, 15 (1933) ("There is a privilege protecting communications between attorney and client.  The privilege takes flight if the relation is abused.  A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law.").  Thus, notwithstanding attorneys' obligations to clients, it is unremarkable that the Second Circuit has repeatedly upheld attorneys' convictions for immigration fraud, even though those attorneys had owed a duty of loyalty to their immigration clients. *See, e.g.*, *Dumitru*, 991 F.3d at 429; *United States v. Archer*, 671 F.3d 149 (2d Cir. 2011).[13]  Nor is the Court persuaded that CS-1's and CS-3's payments to Greenberg to participate in fraud constituted outrageous conduct.  Courts have held, for example, that cash payments as large as $250,000 are not coercive when offered to commit a crime. *See United States v. Cromitie*, 727 F.3d 194, 220–21 (2d Cir. 2013).

Fourth, the Court will not dismiss the indictment on the grounds that the Government obtained statements from Greenberg in the course of civil asylum proceedings that the Government instituted for the purpose of investigating the Defendants.  Greenberg does not cite any case in which the use of civil proceedings in an investigation was outrageous conduct that justified dismissal.  Rather, she cites three cases in which defendants sought to suppress deposition testimony given in civil enforcement proceedings that paralleled a criminal

---

[13] Greenberg's position is not aided by her citation to *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704 (2005), for the proposition that attorneys are permitted to advise clients to withhold information from the government.  That case does not suggest that attorneys cannot be held criminally liable for their actions in the course of advising clients.  Rather, *Arthur Andersen* more narrowly held that the criminal statute at issue—which punished "corrupt[t] persua[sion]" under 18 U.S.C. § 1512(b)—requires that an offending attorney *know* the advice was criminal. *Id.* at 704–06.

investigation, only one of which granted the defendant's motion.  Greenberg Br. at 29 (citing *United States v. Kordel*, 397 U.S. 1, 11–12 (1970) (suggesting in dicta that suppression may be warranted "where the Government has brought a civil action solely to obtain evidence for its criminal prosecution"); *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1140 (N.D. Ala. 2005) (in a criminal prosecution, suppressing a civil deposition because "the S.E.C. civil investigation became inescapably intertwined with the criminal investigation"); *United States v. Teyibo*, 877 F. Supp. 846, 856–57 (S.D.N.Y. 1995) (declining to suppress a civil deposition taken by the SEC under subpoena because the government did not pursue the "civil action solely to obtain evidence for a criminal prosecution" and there was no "coercive environment")).[14]  Greenberg, in her opening brief, did not make a motion to suppress statements made during these asylum interviews.  In her reply brief, she makes the request for the first time in a short paragraph. Greenberg Reply at 19.  "It is well-established that arguments raised for the first time in a movant's reply are waived."  *Parnass v. Brit. Airways, PLC*, No. 1:19-CV-04555 (MKV), 2021 WL 4311342, at *7 (S.D.N.Y. Sept. 21, 2021).  Accordingly, the Court will not now resolve whether suppression of any statements Greenberg made in asylum interviews is justified.[15]

At bottom, the Government's investigation of Greenberg did not approach the kind of outrageous conduct that justifies dismissal of an indictment.  The Court therefore rejects this ground for dismissing the indictment.

### B.  Motion to dismiss as duplicitous

---

[14] In *Scrushy*, the district court dismissed three counts of perjury only because they rested entirely on statements made in the deposition that the court suppressed.  366 F. Supp. 2d at 1140. But here, the immigration-fraud count against Greenberg does not rely entirely on the statements she made during CS-1's and CS-3's asylum interviews.

[15] Moreover, as further explained in Section III.E.3, a motion to suppress must be accompanied by a sworn affidavit, which Greenberg has not supplied here.

Greenberg next argues that the indictment should be dismissed because the single count of conspiracy to commit immigration fraud is duplicitous, charging distinct conspiracies in a single count. Specifically, she argues that the other Defendants' alleged conspiracy had the objective to "assist in preparing and filing asylum applications containing false statements" while her alleged conspiracy had the objective to "conceal [those applicants'] lies during asylum interviews." Greenberg Br. at 31.

### 1. Applicable law

"An indictment is duplicitous if it joins two or more distinct crimes in a single count. A duplicitous indictment, which alleges several offenses in the same count, must be distinguished from 'the allegation in a single count of the commission of a crime by several means.' The latter is not duplicitous." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992) (citations omitted) (quoting *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980)). "Duplicitous pleading . . . is not presumptively invalid." *United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006). Rather, duplicitous pleading is prohibited only where it prejudices the defendant. *United States v. Sturdivant*, 244 F.3d 71, 75 & n.3 (2d Cir. 2001). That determination of prejudice is guided by the "policy considerations" that underlie duplicity doctrine, which include:

> avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.

*United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (citing *Murray*, 618 F.2d at 896–97).

"A conspiracy indictment presents 'unique issues' in the duplicity analysis because 'a single agreement may encompass multiple illegal objects.'" *Aracri*, 968 F.2d at 1518 (quoting

*Murray*, 618 F.2d at 896).  "In this Circuit it is well established that the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects."  *Id.* (cleaned up).

In a pretrial motion to dismiss a count as duplicitous, the Court considers only the indictment "on its face."  *United States v. Miller*, 26 F. Supp. 2d 415, 422–23 (N.D.N.Y. 1998) (citing *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981)); *see United States v. Walsh*, 194 F.3d 37, 46 (2d Cir. 1999) (explaining that in a *post*-trial motion, a court "may consider the record as a whole in determining whether an indictment is in fact multiplicitous or duplicitous"); *accord United States v. Eufrasio*, 935 F.2d 553, 567 (3d Cir. 1991) ("In determining whether a trial court erred by joining multiple defendants under Rule 8(b), we focus on the indictment, not on the proof subsequently adduced at trial." (cited by Greenberg Br. at 31)).  Pretrial dismissal is inappropriate so long as "the Court cannot conclude on the basis of the pleadings alone that there is *no* set of facts . . . that could warrant a reasonable jury in finding a single conspiracy."  *United States v. Gabriel*, 920 F. Supp. 498, 505 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997). Otherwise, "[t]he question whether the proof establishes a single or multiple conspiracies is an issue of fact 'singularly well-suited to resolution by the jury.'"  *United States v. Potamitis*, 739 F.2d 784, 787 (2d Cir. 1984) (quoting *United States v. McGrath*, 613 F.2d 361, 367 (2d Cir. 1979)).

### 2. Analysis

The Court concludes that the single count is not duplicitous because it alleges a single crime of conspiracy in which all of the Defendants participated.  The superseding indictment alleges that Russian America employees Mosha and Danskoi referred clients to non-employees, including Greenberg, to assist in the preparation and submission of fraudulent asylum

24

applications.  S1 Indictment ¶ 2.  While other Defendants prepared written applications,

Greenberg's alleged role in this conspiracy was to "knowingly prepare[] and encourage[] certain

Russian America clients to lie under oath about their fraudulent asylum claims" and to

accompany them to their interviews.  *Id.* ¶¶ 7, 9.  As the alleged facts outlined above reflect, the

selected pretrial materials proffered by the parties demonstrate that Mosha and Danskoi knew

Greenberg and referred clients to Greenberg, and that Greenberg knew that Mosha and Danskoi,

as well as others connected to Russian America, had assisted in the preparation of those clients'

asylum applicants.  And at the stage of conducting asylum interviews, Russian America provided

further assistance, such as supplying translators.

Greenberg argues that the conspiracy in which she was allegedly involved was distinct

from that in which the other Defendants were involved.  She refers the Court to the *Korfant*

factors, which courts in this circuit use to determine whether two conspiracies constitute the

same offense for purposes of the Double Jeopardy Clause.  Greenberg Br. at 34 (citing *United*

*States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985)).  Those factors include:

> (1) the criminal offenses charged in successive indictments; (2) the overlap of
> participants; (3) the overlap of time; (4) similarity of operation; (5) the existence
> of common overt acts; (6) the geographic scope of the alleged conspiracies or
> location where overt acts occurred; (7) common objectives; and (8) the degree of
> interdependence between alleged distinct conspiracies.

> *United States v. Hernandez*, No. 09 CR 625 (HB), 2009 WL 3169226, at *9 (S.D.N.Y.

Oct. 1, 2009) (quoting *United States v. Macchia*, 35 F.3d 662, 668 (2d Cir. 1994)).

Without deciding whether the *Korfant* factors are controlling in a determination of

duplicity, the Court considers Greenberg's application of the factors.  Greenberg argues, first,

that the objective of the other Defendants' conspiracy was to submit a fraudulent Form I-589

while her alleged conspiracy's objective was "for the limited and express purpose of preparing

and accompanying the clients to their asylum interviews."  Greenberg Br. at 35.  She cites

primarily *United States v. Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996), which dismissed one of

eighteen counts in an indictment on statute-of-limitations grounds because that count alleged a

conspiracy distinct from the others alleged.  Relevant here, *Gabriel* concluded that one

conspiracy was by an airplane parts repairer to defraud its customers by using substandard repair

methods while a distinct conspiracy later in time, perpetrated by executives that later joined the

repair company, sought to "limit the damage" of subsequent investigations and lawsuits by

downplaying the extent to which the fraud was intentional.  *Id.* at 503–04.

      The Court concludes, however, that the superseding indictment alleges a single objective

of the conspiracy:  to obtain completed Forms I-94—that is, proof of asylum—for Russian

America's clients.  That objective required both the written applications in which Mosha,

Danskoi, and the other Defendants, were allegedly involved, as well as the in-person interview in

which Greenberg was allegedly involved.  After all, submitting a Form I-589 is, in itself,

insufficient to obtain asylum protection because the applicant must also pass an in-person

interview.  *See* 8 U.S.C. § 1158(d)(5)(A)(ii); 8 C.F.R. §§ 1208.10, 1208.13(d)(2)(i)(H).

Consider, by analogy, a student who submits an application to a college:  Her objective is to gain

admission, not simply to apply.  That is true even if the college further requires that the student

pass an in-person interview.  In either instance, both actions are necessary steps toward the

ultimate objective of gaining admission.  This case is therefore unlike *Gabriel*, where the later

conspiracy to cover up fraud had a distinct objective from the completed conspiracy to commit

the fraud.  Further, even if Greenberg's particular objective was distinct from that of the other

Defendants, that would not require a conclusion that the count is duplicitous because "a single

agreement may encompass multiple illegal objects."  *Murray*, 618 F.2d at 896.

Greenberg also argues that the superseding indictment alleges two distinct conspiracies because even if Greenberg made an unlawful agreement, it was only with the Government's cooperating witnesses, which is insufficient to allege a conspiracy.  Greenberg Br. at 33; *see, e.g.*, *United States v. Rosenblatt*, 554 F.2d 36, 38 & n.2 (2d Cir. 1977) (holding that there can be no conspiracy with only a "government informant who secretly intends to frustrate the conspiracy" (citing *Sears v. United States*, 343 F.2d 139 (5th Cir. 1965)).  As an initial matter, Greenberg's argument requires that the Court look at materials outside the indictment, which it cannot do at this stage as to this claim.  But even taking account of additional materials, the Court would still reject Greenberg's claim.  Crucially, "[a] conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (quoting *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001)).  And "[a] defendant can conspire with individuals he has never met, so long as he participates and is aware of their assistance in the criminal venture." *United States v. Medina*, 32 F.3d 40, 44 (2d Cir. 1994).  Further, though agreement with a government informant alone cannot establish a conspiracy, "a government agent may serve as a 'link' between 'genuine' conspirators," and a conspiracy may exist where one conspirator "communicated solely through" a government agent. *Id.* (cleaned up); *see also United States v. Cordero*, 668 F.2d 32, 43 (1st Cir. 1981) (Breyer, J.). Last, "[t]he defendant's participation in a single transaction can, on an appropriate record, suffice to sustain a charge of knowing participation in an existing conspiracy." *United States v. Santos*, 541 F.3d 63, 73 (2d Cir. 2008) (quoting *United States v. Miranda–Ortiz*, 926 F.2d 172, 176 (2d Cir. 1991)).  These principles in mind, the Court finds an adequate basis to permit a reasonable jury to find that Greenberg conspired with the other Defendants, even if that agreement was not

made explicitly, was made using CS-1 and CS-3 as "links," and/or involved only a single transaction.

Greenberg also argues, citing the *Korfant* factors, that the difference in time between her actions and the actions of the other Defendants is too great, disproving that there was a single conspiracy. But courts have declined to dismiss counts as duplicitous even where longer periods of time have passed between alleged coconspirators' actions. *E.g.*, *United States v. Willis*, 475 F. Supp. 2d 269, 273 (W.D.N.Y. 2007) (fifteen-month conspiracy alleged). And in the context of the conspiracy alleged here, a substantial period of time between the submission of an application and an applicant's interview is consistent with the significant wait times that applicants face in the asylum process. *Cf., e.g.*, *Fangfang Xu v. Cissna*, 434 F. Supp. 3d 43, 60 (S.D.N.Y. 2020) ("The swell in asylum applications had produced a rapidly increasing backlog of asylum applications and left the asylum system prone to fraud . . . ."); *Yueliang Zhang v. Wolf*, No. 19-CV-5370 (DLI), 2020 WL 5878255, at *5 (E.D.N.Y. Sept. 30, 2020).

Even if the Court concluded that the single-count indictment alleged two distinct conspiracies such that the count is duplicitous, Greenberg has not demonstrated that the duplicity is prejudicial to her. *See Margiotta*, 646 F.2d at 733. The superseding indictment provides Greenberg adequate notice of the conduct alleged and the timing of that conduct. Further, a general verdict of guilty is unlikely to conceal a finding of not guilty as to one of the crimes. If a jury were to conclude, for instance, that Greenberg did not participate in a conspiracy but that the other Defendants did, then the jury would be required to return a verdict of not guilty as to Greenberg.

The Court therefore denies Greenberg's motion to dismiss the count against her as duplicitous.

### C.  Motion to sever Greenberg

Related to her claim that the count of conspiracy to commit immigration fraud is duplicitous, Greenberg next argues that, at the least, her trial should be severed from that of her co-Defendants.

#### 1.  Applicable law

Under Federal Rule of Criminal Procedure 8,

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).

This language means that "joinder of defendants is appropriate where the alleged criminal conduct is 'unified by some substantial identity of facts or participants, or arise out of a common plan or scheme.'"  *United States v. Burke*, 789 F. Supp. 2d 395, 398 (E.D.N.Y. 2011) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)).  Relevant here, joinder may be satisfied "where the Government alleges the existence of an overall conspiracy linking the various substantive crimes charged in an indictment," *United States v. Lech*, 161 F.R.D. 255, 256 (S.D.N.Y. 1995), or where the indictment charges multiple conspiracies that "arise from a common plan or scheme," *United States v. Moon*, No. 88-CR-64, 1988 WL 88056, at *3 (N.D.N.Y. Aug. 23, 1988) (quoting *United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir. 1985)), or where multiple conspiracies are otherwise "'intertwined' with each other," *United States v. Tuzman*, 301 F. Supp. 3d 430, 439 (S.D.N.Y. 2017) (quoting *Attanasio*, 870 F.2d at 815).

"There is a preference in the federal system for joint trials of defendants who are indicted together."  *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam) (quoting

*Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *see also Richardson v. Marsh*, 481 U.S. 200, 209–10 (1987) (explaining that "[j]oint trials play a vital role in the criminal justice system"). But if joinder is not permitted under Rule 8(b), then the Court must sever the defendants. *United States v. Lane*, 474 U.S. 438, 449 (1986) ("Rule 8(b), however, requires the granting of a motion for severance unless its standards are met, even in the absence of prejudice . . . ."). Additionally, even if joinder is proper under Rule 8(b), a court may nevertheless grant severance "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant." Fed. R. Crim. P. 14(a). A defendant that seeks severance carries an "extremely difficult burden," *Tuzman*, 301 F. Supp. 3d at 440 (quoting *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989)), as they "must show not simply some prejudice but *substantial* prejudice," *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (quoting *United States v. Werner*, 620 F.2d 922, 928 (2d Cir. 1980)). The Supreme Court has instructed that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Whether to grant severance is reserved "to the district court's sound discretion." *Id.*

### 2. Analysis

The Court concludes, first, that joinder was proper. As explained above, the single count alleges a single conspiracy that includes Greenberg and the other Defendants. That conspiracy is alleged to have the objective of fraudulently obtaining asylum relief for Russian America's clients. Some of the Defendants are alleged to have participated in earlier stages of the asylum-application process, such as assisting in the preparation of the clients' asylum affidavits or by

30

writing the clients' blogs to provide a basis for asylum.  But even if Greenberg was involved only in the clients' later in-person interviews with Asylum Officers, participation in that "single transaction" would be sufficient to sustain a charge of conspiracy, especially because the conspiracy's objective could be obtained only if clients pass those interviews.  *Santos*, 541 F.3d at 73.

Greenberg argues again, as she did with regard to duplicity, that the other Defendants engaged in a distinct conspiracy of submitting an asylum application, arguing that the submission of Form I-589 was a "completed 'act or transaction'" in which Greenberg did not participate. Greenberg Br. at 38.  But, as explained, this parsing of the indictment is artificial.  Submitting a Form I-589 cannot result in the desired Form I-94 without an in-person interview.  Greenberg's argument that she and Russian America must have been involved in separate conspiracies because Russian America was not a law firm does not change this calculus.  Rather, a jury could find that Greenberg's role within the alleged conspiracy, as a licensed immigration attorney, was to provide those services that Russian America was legally barred from providing, such as appearing at an asylum interview.  *See* 8 C.F.R. § 292.4 (providing that an appearance in an asylum proceeding may be filed only by an "attorney or accredited representative"); *see also* Greenberg Br., Ex. N at 9 (Greenberg told CS-1, "You cannot say at all that [Mosha] is an attorney or provides legal services. . . .  He fills out documents and does translations.  He has no right to give you legal *advice* or anything like that.").  Similarly, Greenberg's observation that the other Defendants allegedly completed the substantive offense of immigration fraud before Greenberg assisted CS-1 and CS-3 in their interviews, Greenberg Br. at 44, is irrelevant to whether the Defendants entered into a conspiracy to commit immigration fraud.

31

Greenberg also reiterates that the superseding indictment alleges distinct conspiracies because the conspiracies "took place at a much different time, in different places, during different states of asylum process, and had different participants."  Greenberg Br. at 41.  These differences in the Defendants' roles, however, are not sufficient to conclude that Greenberg was misjoined.  Greenberg's role, as alleged, took place at a different time at a later stage in the asylum process, but her role was nevertheless necessary to achieve the conspiracy's objective. And while Greenberg is not alleged to have been in Russian America's offices with Mosha and Danskoi, the conduct alleged in the superseding indictment is centered on the same geographic location of New York City.

Greenberg likens her case to *United States v. Kouzmine*, 921 F. Supp. 1131 (S.D.N.Y. 1996), which found that distinct conspiracies to commit immigration fraud were misjoined.  But there, the court found, and the government acknowledged, that defendants involved in an earlier conspiracy did not have "any knowledge whatever of the latter offenses," and that there was "no colorable argument . . . that both conspiracies alleged . . . were part of a single overarching scheme." *Id.* at 1133.  Here, by contrast, the superseding indictment expressly alleges that all six Defendants entered a single conspiracy to submit fraudulent asylum applications.  S1 Indictment ¶ 2.  And, further unlike *Kouzmine*, the Defendants are alleged to have been aware of each others' roles, as Mosha and Danskoi "connected" and "referred" clients to Greenberg.  *Id.* ¶¶ 7, 9.

For similar reasons, Greenberg's citation to *United States v. Lech*, 161 F.R.D. 255 (S.D.N.Y. 1995), is unavailing.  There, a seven-count indictment alleged three separate schemes to fraudulently obtain construction permits from the New York City Board of Education.  *Id.* at 255–56.  As with *Kouzmine*, the government conceded that the participants in each scheme "did

not participate in, or have specific knowledge of, the [other] schemes," requiring severance.  *Id.*
at 256–57.  Again, those facts are distinguishable from the present case where the superseding
indictment alleges a single conspiracy in which all Defendants participated.

Greenberg further argues that she had no knowledge, at the time that CS-1's and CS-3's
asylum applications were submitted, that the applications were fraudulent.  Greenberg Br. 43–44.
Whether Greenberg had adequate knowledge of the conspiracy raises a question of the
sufficiency of the evidence and so is properly a question for the jury.  However, the Court notes
that "[a] defendant need not have joined a conspiracy at its inception in order to incur liability for
the unlawful acts of the conspiracy committed both before and after he or she became a
member."  *Santos*, 541 F.3d at 73 (quoting *United States v. Rea*, 958 F.2d 1206, 1214 (2d Cir.
1992)).

Having concluded that joinder was proper, the Court further concludes that Greenberg
has not carried her burden of making a substantial showing of prejudice as would justify
severance.  She points first to the risk of prejudice that evidence of Russian America's actions
will be improperly considered by the jury as proof of Greenberg's guilt.  Greenberg Br. at 45–46
(citing *Zafiro*, 506 U.S. at 539).  But where the Government has alleged a single conspiracy, as
here, "all the evidence admitted to prove that conspiracy, even evidence relating to acts
committed by co-defendants, is admissible against the defendant."  *United States v. Salameh*,
152 F.3d 88, 111 (2d Cir. 1998).  Further, juror confusion can be addressed with "less drastic
measures, such as limiting instructions."  *Zafiro*, 506 U.S. at 539.

Greenberg also claims that as an attorney, she may raise additional defenses that are
unavailable to her non-attorney co-Defendants.  Greenberg Br. at 46.  But "it is well settled that
defendants are not entitled to severance merely because they may have a better chance of

acquittal in separate trials." *Zafiro*, 506 U.S. at 540.  Further, that defendants have distinct

defense theories is not a sufficient basis for severance.  Indeed, the Supreme Court has held that

even when defendants have "conflicting" or "[m]utually antagonistic defenses," that is "not

prejudicial *per se*."  *Id.* at 538; *see also United States v. Stein*, 428 F. Supp. 2d 138, 144

(S.D.N.Y. 2006).

   Even if Greenberg did identify prejudice, it would not reach the high bar required by Rule

14.  That is especially so because the prejudice to Greenberg is not "sufficiently severe to

outweigh the judicial economy that would be realized by avoiding lengthy multiple trials."

*United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (quoting *United States v. Panza*, 750

F.2d 1141, 1149 (2d Cir. 1984)); *see Stein*, 428 F. Supp. 2d at 145 (listing as efficiencies "the

risk of inconsistent verdicts, the burden on the court and the prosecution of trying the defendants

or several groups of defendants *seriatim*, and the need for defense counsel to cover repeatedly on

cross-examination in successive trials material that could be covered but once in a joint trial").

   The Court therefore denies Greenberg's claim of misjoinder and, further, denies her

request to be severed from the other Defendants.

   **D.  Motion to dismiss for failure to state a crime**

   Greenberg next raises a series of argument as to why the superseding indictment does not

allege a crime.  In evaluating these claims, the Court may not "look beyond the face of the

indictment and draw inferences as to proof to be adduced at trial, for 'the sufficiency of the

evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.'"  *Scully*,

108 F. Supp. 3d at 116–17; *see also Sampson*, 898 F.3d at 280.

   Greenberg was charged with a single count of conspiracy to commit immigration fraud

under both 18 U.S.C. § 371 and 18 U.S.C. § 1546(a).  She argues that the count cannot stand

under § 1546(a) because that provision criminalizes only the possession of a fraudulent proof of lawful immigration status—here, a completed Form I-94—which is not the conduct in which she allegedly engaged.  Nor can the count stand under § 371, she continues, because she had no duty to disclose the truth to USCIS and so did not defraud any U.S. agency.  Last, she argues that her alleged conduct of advising her clients—even advising them to lie to USCIS—is protected by the First Amendment.

The Court addresses first Greenberg's arguments under § 1546(a) because, Greenberg claims, the § 371 charge depends at least in part on the validity of the § 1546(a) charge.

### 1.  The superseding indictment is sufficiently pled

As an initial matter, to be legally sufficient, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *Stringer*, 730 F.3d at 124.  Consequently, "[c]ourts have repeatedly refused, in the absence of prejudice, to dismiss counts of indictments for lack of specificity '[w]hen the charges in an indictment have stated the elements of the offense and provided even minimal protection against double jeopardy.'"  *United States v. Nejad*, No. 18-CR-224 (AJN), 2019 WL 6702361, at *15 (S.D.N.Y. Dec. 6, 2019) (quoting *Stringer*, 730 F.3d at 124).

The superseding indictment exceeds these baseline requirements.  In addition to reciting the elements of the charged statutes, *e.g.*, S1 Indictment ¶¶ 18–19, it states the approximate time period of the conspiracy (August 2018 to February 2021), and the approximate locations (namely, the Southern District of New York, Manhattan, and Brooklyn), *id.* ¶¶ 1, 17.  Further, the superseding indictment lists seven overt acts that make up the conspiracy, and for each identifies an approximate time and place.  *Id.* ¶ 20.  No more is required.  *See Scully*, 108 F.

Supp. 3d at 116.  Nevertheless, the Court will additionally address Greenberg's particular

arguments as to why the superseding indictment is facially insufficient.

### 2.   Whether § 1546 covers the alleged crime

Section 1546(a) of title 18 contains four paragraphs.  The Government's brief argues only

that Greenberg can be convicted under the first paragraph of these paragraphs, and the Court

therefore considers only whether Greenberg's alleged conduct is prohibited under the first

paragraph.[16]  That paragraph states in full:

> Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant
> or nonimmigrant visa, permit, border crossing card, alien registration receipt card,
> or other document prescribed by statute or regulation for entry into or as evidence
> of authorized stay or employment in the United States, or utters, uses, attempts to
> use, possesses, obtains, accepts, or receives any such visa, permit, border crossing
> card, alien registration receipt card, or other document prescribed by statute or
> regulation for entry into or as evidence of authorized stay or employment in the
> United States, knowing it to be forged, counterfeited, altered, or falsely made, or
> to have been procured by means of any false claim or statement, or to have been
> otherwise procured by fraud or unlawfully obtained;

18 U.S.C. § 1546(a) ¶ 1.

In interpreting criminal statutes, the Court is mindful that it must "construe criminal

statutes narrowly."  *United States v. Valle*, 807 F.3d 508, 528 (2d Cir. 2015) (quoting *United

States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012)).  The Supreme Court instructed as much

when interpreting the same statute at issue here.  *United States v. Campos-Serrano*, 404 U.S.

293, 297 (1971) ("It has long been settled that penal statutes are to be construed strictly, and that

one is not to be subjected to a penalty unless the words of the statute plainly impose it." (cleaned

up)).  But that instruction "does not mean that every criminal statute must be given the narrowest

---

[16] The Government does not contest Greenberg's claim that the fourth paragraph of § 1546(a)
does not cover Greenberg's allegedly false statements that she made orally to USCIS.  *See*
Greenberg Br. at 59; Greenberg Reply at 16 (citing *United States v. Jabateh*, 974 F.3d 281, 297
(3d Cir. 2020) (interpreting the fourth paragraph to apply only to written false statements, not
"false statements made orally under oath")).

possible meaning in complete disregard of the purpose of the legislature." *Moskal v. United States*, 498 U.S. 103, 113 (1990) (quoting *McElroy v. United States*, 455 U.S. 642, 658 (1982)). Greenberg raises three basic arguments for why her conduct alleged in the superseding indictment is not punishable under the terms of § 1546(a)'s first paragraph.  For the reasons following, the Court disagrees.

      *First*, Greenberg argues that a Form I-589 is not covered by § 1546(a) because it is only an application for asylum protection and not itself a "document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States." Greenberg Br. at 54–56 (citing *United States v. Phillips*, 543 F.3d 1197 (10th Cir. 2008)). Rather, she continues, her conduct is covered by the statute only if she conspired to possess a completed Form I-94, which actually authorizes an asylee's entry into, or stay in, the United States.  Greenberg Reply at 10–11.  Whether Greenberg's interpretation of the statute is correct remains an open question in this circuit.  *United States v. Christo*, 413 F. App'x 375, 376 (2d Cir. 2011) (summary order) (citing *Phillips* but concluding that the court "need not reach the question of whether a Form I-589 is a document required for entry into this country"); *see also United States v. Ryan-Webster*, 353 F.3d 353, 357 (4th Cir. 2003) (applying § 1546(a) to the forgery of application materials).  The Government, however, does not contest Greenberg's reading. Instead, it argues that the superseding indictment alleges that Greenberg conspired to "obtain[]" a "document" that "would result from a successful asylum application," namely, a completed Form I-94.  Gov't Br. at 45–46.  The Court therefore assumes without deciding that § 1546(a) covers Greenberg's conduct only if the object of her conspiracy was to obtain a completed Form I-94.

      *Second*, Greenberg argues that the first paragraph of § 1546(a) "does not apply to authentic documents" but punishes only "the forging, counterfeiting, altering or falsely making

of certain immigration documents or their use, possession, or receipt."  Greenberg Reply at 9;

Greenberg Br. at 57.  The possession of an *authentic* immigration document that was obtained by

submitting "false statements in support of an I-589 application," she claims, is punished only by

§ 1546(a)'s fourth paragraph, which the Government has abandoned.  Greenberg Reply at 10.

This interpretation defies the text of the paragraph.  Greenberg emphasizes the first half

of the paragraph—which does proscribe "forg[ing], counterfeit[ing], alter[ing], or falsely

mak[ing]" an immigration document—but ignores the second half that punishes whoever

"possesses, obtains, accepts, or receives any such . . . other document . . . knowing it to be

forged, counterfeited, altered, or falsely made, *or to have been procured by means of any false*

*claim or statement, or to have been otherwise procured by fraud or unlawfully obtained*."  18

U.S.C. § 1546(a) (emphasis added).  This "clear and definite" language, *Campos-Serrano*, 404

U.S. at 298, proscribes not only the knowing possession of a forged or counterfeited document

but also the possession of an authentic document that one knows to have been procured by a

false claim or statement.  This latter prohibition covers the allegations in the superseding

complaint that Greenberg conspired to procure an authentic Form I-94 for asylum applicants by

means of false asylum claims.

That conclusion is consistent, as far as this Court is aware, with the conclusion of every

court to consider the question.  *See United States v. Krstic*, 558 F.3d 1010, 1017 (9th Cir. 2009)

(concluding, after exhaustively considering the statute's text, history, and purpose, that it

"prohibits possessing an otherwise authentic document that one knows has been procured by

means of a false claim or statement"); *United States v. Kouevi*, 698 F.3d 126, 139 (3d Cir. 2012)

("The plain language of the statute reveals that the first paragraph of § 1546(a) must be read to

prohibit the possession or use of authentic immigration documents which are obtained by

38

fraud."); *see also United States v. Kantengwa*, No. CRIM.A. 08-10385-RGS, 2012 WL 4591891,

at *2 n.5 (D. Mass. Oct. 3, 2012), *aff'd*, 781 F.3d 545 (1st Cir. 2015) (citing *Krstic*); *United

States v. Cvijanovic*, No. 10-CR-280, 2011 WL 1498599, at *2 (E.D. Wis. Feb. 8, 2011), *report

and recommendation adopted*, 2011 WL 1498595 (E.D. Wis. Apr. 19, 2011) (observing that

Congress "criminaliz[ed] not merely the making of a false statement on an immigration forms,

but also the possession of immigration documents obtained as a result of those false

statements"); *United States v. Jakisa*, No. 14-CR-119 SRN/SER, 2015 WL 520618, at *5 (D.

Minn. Feb. 9, 2015) (citing *Cvijanovic*).

Greenberg dismisses this straightforward reading of the statute in two ways.  First, she

argues, the Supreme Court has "literally opined" on this issue and agreed that the first paragraph

of § 1546(a) is only a counterfeiting prohibition, Greenberg Reply at 9–10, quoting dicta that

appears in a footnote in *Campos-Serrano*: "The prohibition of counterfeiting in § 1546 is

contained in the first paragraph of that section.  The prohibition of fraud in the acquisition of

documents is contained in the third paragraph of § 1546."  404 U.S. at 301 n.13 (cleaned up).

But "*Campos–Serrano* cannot support the weight [Greenberg] places upon it."  *Krstic*, 558 F.3d

at 1014.  At issue in *Campos-Serrano* was the distinct question of whether the statute covered the

act of counterfeiting an alien registration receipt card, and the Court held it did not.  *Id.* at 300–

01.  The Supreme Court had no reason to consider whether the first paragraph also covered an

authentic document that was procured by fraud.  The opinion's "one-line description" of the

statute "revises (for easier reading) the statute's own" language—it does not purport to be

comprehensive or binding.  *Borden v. United States*, 141 S. Ct. 1817, 1833 n.9 (2021); *see

Krstic*, 558 F. 3d at 1014 (explaining that this language in *Campos-Serrano* "merely serves as

general background information about the statute; it does not purport to be a comprehensive catalog of all conduct prohibited by the statute").[17]

Second, Greenberg argues that interpreting the first paragraph to cover both authentic and inauthentic documents must be rejected because it would render superfluous § 1546(a)'s fourth paragraph. Greenberg Reply at 11, 14. The Court disagrees. Each paragraph still has independent effect. The fourth paragraph prohibits the act of making a false statement under oath "in any application, affidavit, or other document required by the immigration laws." 18 U.S.C. § 1546(a). Only the first paragraph covers "*possession* of an immigration document that was fraudulently obtained." *Krstic*, 558 F.3d at 1017. Moreover, Greenberg's interpretation creates its own surplusage problem, as it gives no effect to the first paragraph's proscription of possessing a document knowing it "to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained." *Id.*; *see Kouevi*, 698 F.3d at 133–34 (rejecting Greenberg's interpretation because otherwise "the last clause . . . is transformed into surplusage; it would add absolutely nothing to what comes before it"). Last, though courts should minimize surplus text in a statute, "[t]he canon against surplusage is not an absolute rule." *Panjiva, Inc. v. U.S. Customs & Border Prot.*, 975 F.3d 171, 179 (2d Cir. 2020) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013)).

---

[17] Nor is the Court persuaded by language that Greenberg quotes from the United States Attorneys' Manual, Greenberg Br. at 57, which states that "[t]he first paragraph of 18 U.S.C. § 1546(a) proscribes the forging, counterfeiting, altering or falsely making of certain immigration documents or their use, possession, or receipt." U.S. Dep't of Just., Just. Manual § 9-73.000. That language refers to one application of § 1546(a), but it does not exclude the interpretation the Court adopts here; moreover, it cannot bind this Court. *See Kouevi*, 698 F.3d at 137–38 (rejecting this same argument).

The Court therefore interprets the first paragraph of § 1546(a) to cover authentic immigration documents—including Form I-94—that were "procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained."

*Third*, Greenberg asserts that even if § 1546(a) is interpreted to cover an authentic Form I-94, she "couldn't have conspired to obtain an I-94 card."  Greenberg Reply at 11.  Greenberg's precise claim is unclear, but it appears to rest on two premises.  First, she asserts that the word "obtain" in § 1546(a) means "simply 'taking possession'" and so "does not extend to the process of unlawfully applying for an immigration document."  *Id.* at 11.  In other words, she says, the second half of the first paragraph punishes only "the literal knowing possession of fraudulently made or obtained documents."  *Id.* at 12.  As with her prior argument, she claims that only the fourth paragraph "punish[es] the effort of obtaining . . . authentic immigration documents."  *Id.* at 13.  Second, she argues, the Defendants could not have conspired to obtain a Form I-94 because submitting an application and appearing at an interview before an Asylum Officer "*does not*, in and of itself, result in the issuance of an I-94," noting that "only 29.8% of asylum applications" get approved.  *Id.* at 13–14; *see also id.* at 13 n.4 (arguing that the Government's theory of the case "could only actually work if the Government also theorized and established that the Defendants were in collaboration with a corrupt actor at USCIS, who was going to help them assuredly 'obtain' these fraudulently emitted I-94s").

Neither of these premises withstands scrutiny.  Greenberg's unsourced definition of the term "obtain" as synonymous with "possess" fails to give the terms independent effect.  Rather, obtain is better defined to mean "to procure, esp[ecially] through effort" or "[t]o succeed either in accomplishing (something) or in having it be accomplished; to attain by effort," such as "to obtain a loan."  *Obtain*, Black's Law Dictionary (11th ed. 2019); *see also Obtain*, Merriam-

41

Webster Dictionary, https://www.merriam-webster.com/dictionary/obtain (accessed March 7, 2022) (defining obtain as "to gain or attain usually by planned action or effort"); *Honeycutt v. United States*, 137 S. Ct. 1626, 1632–33 (2017) (similarly defining "obtain" in 18 U.S.C. § 853(a)(1)). Here, Greenberg allegedly conspired to obtain—that is, to procure or accomplish through effort—a completed Form I-94.[18]  The fact that her effort was not guaranteed to achieve the object of the conspiracy because the ultimate decision to issue a Form I-94 rests with USCIS is irrelevant.  Any criminal enterprise entails the risk of failure.  It is established that because the crime of conspiracy requires only an unlawful agreement, "to be actionable, a conspiracy need not be carried to a successful conclusion."  *United States v. Rosengarten*, 857 F.2d 76, 79 (2d Cir. 1988); *see Christo*, 413 F. App'x at 376 ("Given this, the failure of defendants to finalize and file the Form I–589 does not require the conspiracy conviction be overturned.").[19]

The Court therefore concludes that the first paragraph of 18 U.S.C. § 1546(a) covers Greenberg's conduct alleged in the superseding indictment.  In the language of the statute, the Government has adequately alleged that Greenberg and the other Defendants conspired to "obtain[] . . a[] . . . document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it . . . to have been procured by

---

[18] Greenberg's citations to cases that describe § 1546(a) as a "possessory offense" are inapposite. *E.g.*, Greenberg Reply at 12 (citing *Krstic*, 558 F.3d at 1015).  The issue in those cases was whether the offense was completed when the false statement was made or whether it continued throughout the defendant's possession of the document—a distinction with significant implications for the statute of limitations.  That determination of the statute of limitations did not purport to hold that § 1546(a) punishes *only* possession.

[19] Greenberg again argues that the superseding indictment alleges only that she entered an agreement with government agents, CS-1 and CS-3, which is inadequate to allege a conspiracy. Greenberg Reply at 17–19.  As explained above, the superseding indictment alleges that Greenberg conspired with the other five Defendants and that to the extent CS-1 and CS-3 acted as links between Defendants, that is sufficient to allege a conspiracy.  *See Medina*, 32 F.3d at 44. Greenberg also argues that the Government has not proffered adequate evidence of an agreement.  Greenberg Reply at 19.  The Court cannot resolve this sufficiency-of-the-evidence claim at this juncture.

means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained."  18 U.S.C. § 1546(a).

### 3.  Whether § 371 covers the alleged crime

Section 371, which is titled "Conspiracy to commit offense or to defraud United States," imposes punishment,

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy . . . .

18 U.S.C. § 371 ¶ 1.

Thus, "§ 371 is divisible into two clauses: the 'offense clause' and the 'defraud clause.'" *Rodden v. Wilkinson*, 845 F. App'x 25, 27 (2d Cir. 2021) (summary order).  "The 'offense clause' makes it unlawful to conspire 'to commit any offense against the United States,' while the 'defraud clause' prohibits conspiracies 'to defraud the United States, or any agency thereof in any manner or for any purpose.'"  *United States v. Atilla*, 966 F.3d 118, 130 (2d Cir. 2020).  "To prove a conspiracy under the 'defraud clause,' the government must establish (1) that the defendant entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy."  *Id.* (cleaned up) (quoting *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996)).  Obstruction requires only that the Government show that the alleged act "'interfere[s] with or obstruct[s] one of [the United States'] lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest,' even if the Government is not 'subjected to property or pecuniary loss by the fraud.'"  *Ballistrea*, 101 F.3d at 831–32 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)).

Greenberg argues that the superseding indictment does not allege a violation of the defraud clause.  First, she flatly asserts that the "[f]iling of or presenting false statements in an [asylum] application is not" obstruction of the lawful function of a U.S. agency.  Greenberg Br. at 51.  But the "broad text" of the defraud clause "has been applied to conspiracies to obstruct the functions of a variety of government agencies," *Atilla*, 966 F.3d at 130, including the federal immigration agency, *Lutwak v. United States*, 344 U.S. 604, 605 (1953).  The Court concludes that a conspiracy to obtain asylum protection by submitting false statements to USCIS alleges obstruction of a lawful government function.

Second, Greenberg argues that she did not "defraud" because she did not "owe an independent duty to disclose the client's falsities or forego his representation."  Greenberg Br. at 52 (citing *Chiarella v. United States*, 445 U.S. 222, 235 (1980) (defining fraud under Section 10(b) of the Securities Exchange Act of 1934)).  This argument misapprehends the superseding indictment, which alleges that Greenberg and her co-Defendants conspired to submit "materially false information" in asylum applications to USCIS and that Greenberg in particular prepared clients to make false statements at interviews, "during which clients and/or GREENBERG made claims that GREENBERG understood were false."  S1 Indictment ¶¶ 1, 7.  Thus, the allegation against Greenberg is not a mere failure to disclose.  Moreover, Greenberg's attempt to narrow the meaning of "defraud" in § 371 by reference to other statutes is unavailing, as it is "well established that the term 'defraud' as used in section 371 'is interpreted much more broadly than when it is used in the mail and wire fraud statutes,'" *Ballistrea*, 101 F.3d at 831 (quoting *United States v. Rosengarten*, 857 F.2d 76, 78 (2d Cir. 1988), and than how it was defined at common law, *United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012).

Last, Greenberg suggests that because § 371 is ambiguous, it should be construed narrowly in accordance with the rule of lenity.  Greenberg Br. at 50 (citing *Lander v. United States*, 358 U.S. 169 (1958)).  But Greenberg has identified no "grievous ambiguity" necessary to invoke lenity.  *Chapman v. United States*, 500 U.S. 453, 463 (1991).

The Court therefore rejects Greenberg's motion to dismiss any charge under 18 U.S.C. § 371.

### 4. Whether Greenberg's conduct is protected by the First Amendment

Greenberg argues that because her advocacy on behalf of her clients, CS-1 and CS-3, was "intended to affect the outcome of a proceeding," it is "protected by the First Amendment. Greenberg Br. at 66 (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972)).  It would not be a crime, she says, if her "purpose may have been to make it more difficult for the USCIS to discover that her clients had perjured themselves."  *Id.* at 66–67.

The contours of Greenberg's First Amendment claim are unclear.  In any event, her argument proves far too much.  Two basic principles of First Amendment doctrine bar Greenberg's challenge.  First, "it has long been established that the First Amendment does not shield knowingly false statements made as part of a scheme to defraud."  *United States v. Konstantakakos*, 121 F. App'x 902, 905 (2d Cir. 2005) (summary order) (citing *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 611 (2003)); *see, e.g.*, *United States v. Rowlee*, 899 F.2d 1275, 1279 (2d Cir. 1990) ("The consensus of this and every other circuit is that liability for a false or fraudulent tax return cannot be avoided by evoking the First Amendment."); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 496 (1982) (holding that the government may "regulate or ban entirely" speech "proposing an illegal transaction").  Second, the government may regulate attorneys' "speech as well as their conduct"

in furtherance of a substantial interest, including "to protect the integrity and fairness of a

[government's] judicial system." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991);

*see also Hersch*, 553 F.3d at 756 ("The ability of the government to regulate the speech of

attorneys is also made evident by [the] Model Rules of Professional Conduct.").  In fact, contrary

to Greenberg's assertions, "the speech of lawyers representing clients in pending cases may be

regulated under a *less* demanding standard" because "[l]awyers representing clients in pending

cases are key participants in the criminal justice system."  *Gentile*, 501 at 1075 (emphasis

added).[20]

Following the above law, the Second Circuit has previously rejected First Amendment

challenges raised by defendants convicted under the statutes at issue, 18 U.S.C. § 1546 and 18

U.S.C. § 371.  *Konstantakakos*, 121 F. App'x at 905 (holding that "§ 1546, on its face, applies

only to knowing falsehoods material to the immigration submission at issue, and . . . such

deliberate falsehoods enjoy no First Amendment protection"); *see also United States v. Daly*,

756 F.2d 1076, 1082 (5th Cir. 1985) (§ 371 "punish[es] actions, not speech. . . . [A]n illegal

course of conduct is not protected by the First Amendment merely because the conduct was in

part initiated, evidenced, or carried out by means of language").  And courts in this circuit have

repeatedly upheld convictions of attorneys convicted for immigration fraud under the statutes.

*See, e.g.*, *Dumitru*, 991 F.3d 427; *Archer*, 671 F.3d 149; *United States v. You*, No. 12-CR-690

(JMF), Dkt. No. 36 (S.D.N.Y. Feb. 5, 2015) (immigration attorney convicted under 18 U.S.C.

---

[20] In a footnote, Greenberg attempts to narrow her objection, stating that she "doesn't argue that any advice by a lawyer is shielded by the First Amendment.  Instead, a restriction on the content of an attorney's advice must be prohibited by a criminal statute to be constitutional."  Greenberg Reply Br. at 20 n.6.  But this clarification is question begging.  The statutes at issue expressly criminalize certain types of speech when made to the United States.  Namely, as explained, 18 U.S.C. § 1546(a) proscribes the act of obtaining an immigration document that was "procured by means of any false claim or statement."

§§ 371, 1546(a)); *United States v. Philwin*, No. 11-CR-424-13 (NRB), Dkt. No. 255 (S.D.N.Y. May 10, 2013) (immigration attorney convicted under 18 U.S.C. § 371).

Greenberg's cited case law does not require a contrary conclusion.  She cites initially to *California Motor Transport*, but there, in rejecting a First Amendment defense to an alleged antitrust violation, the Supreme Court stated that "[i]t is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute."  404 U.S. at 514; *see also id.* at 515 ("First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control." (citation omitted)).

Second, Greenberg cites to a concurring opinion in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), where the Ninth Circuit upheld, on First Amendment grounds, a permanent injunction that prevented the federal government from investigating any physician or revoking any physician's license solely because that physician recommended medical marijuana to their patients.  That holding was justified, in part, by the protections traditionally afforded to the doctor-patient relationship and to commercial speech.  *Id.* at 636–37.  A concurrence quoted by Greenberg explained that "the fulcrum of this dispute is not the First Amendment right of the doctors" but instead the disparity between the minimal benefit that doctors derived from giving such advice to their patients and the immense burden that they faced by giving the advice— namely, the potential loss of their licenses and livelihoods.  *Id.* at 639–40 (Kozinski, J., concurring).  This reasoning, which is not binding on this Court, is distinguishable.  The speech alleged here was the knowing submission of false statements to a federal agency, and such fraudulent statements, unlike commercial speech or speech made in private by a doctor to a patient, are not protected by the First Amendment.  *Konstantakakos*, 121 F. App'x at 905.

47

Moreover, the federal government has a far more "immediate[]" and "direct[]" interest in preventing the obstruction of an agency's lawful functions than it did in preventing doctors' encouragement of marijuana usage in *Conant*.   309 F.3d at 640 (Kozinski, J., concurring).   And last, the Court notes that unlike the physicians in *Conant*, Greenberg here is alleged to have received direct financial compensation for her advice to clients and statements to USCIS.

Finally, Greenberg on February 11, 2022, filed a letter notifying the Court of the Ninth Circuit's decision in *United States v. Hansen*, --- F.4th ---, No. 17-10548, 2022 WL 402897 (9th Cir. Feb. 10, 2022).   That decision held that 8 U.S.C. § 1324(a)(1)(A)(iv)—which punishes any person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law"—is facially overbroad under the First Amendment because it "encompasses a vast amount of protected speech related to immigration, including general immigration advocacy" while the government has an interest only in a "narrow prohibition on speech integral to criminal conduct."   *Id.* at *3.

The Court rejects Greenberg's reliance on *Hansen* because Greenberg did not raise an overbreadth challenge in her prior briefing to the Court.   *See* Greenberg Br. at 66–67; Greenberg Reply at 19–21.   The argument, whatever its merits, is therefore waived.   *Parnass*, 2021 WL 4311342, at *7.[21]   Even if the Court considered the merits of *Hansen*, the Court finds its

---

[21] In fact, *Hansen*'s procedural history tells a cautionary tale.  The Ninth Circuit had held § 1324(a)(1)(A)(iv) unconstitutionally overbroad in a prior opinion, *United States v. Sineneng-Smith*, 910 F.3d 461, 485 (9th Cir. 2018), but the Supreme Court vacated the decision because the defendant had argued only that the statute was unconstitutional as to her and the Ninth Circuit abused its discretion in reaching to find the statute unconstitutionally overbroad, *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1578 (2020).  The Court will not accept Greenberg's invitation to commit a similar error here.

reasoning distinguishable.[22]  Unlike the provision at issue in *Hansen*, the Second Circuit has

concluded that § 1546(a) "applies only to knowing falsehoods material to the immigration

submission at issue," which "enjoy no First Amendment protection."  *Konstantakakos*, 121 F.

App'x at 905.

Accordingly, Greenberg has not made an adequate showing that the conduct alleged in

the superseding indictment is protected by the First Amendment.[23]

### E.  Motion to suppress

Greenberg next argues that the statements she made to officers shortly after her arrest in

Colorado without the presence of counsel must be suppressed as obtained in violation of the

Fifth Amendment because, she claims, the Government "coerced Greenberg to provide

statements against her interests after she was arrested."  Greenberg Br. at 68.  At the Court's

order, the Government supplied an audio recording of the complete statement.  Though the

parties disagree about whether the statement is voluntary as a matter of law, Greenberg accepts

the veracity of the recording and relies on it in her own briefing.  The Court therefore finds that it

can resolve Greenberg's motion without an evidentiary hearing.  *See United States v. Cobb*, 544

F. Supp. 3d 310, 339–40 (W.D.N.Y. 2021).

---

[22] The precise question decided in *Hansen* remains an open one in this circuit, though other
courts in the circuit have expressed sympathy for the claim as to § 1324.  *United States v.
Raniere*, 384 F. Supp. 3d 282, 309 (E.D.N.Y. 2019).

[23] Greenberg also argues that the superseding indictment effectively imposed on her a duty to
investigate and report her clients, citing in support cases including *U.S. ex rel. Wilcox v.
Johnson*, 555 F.2d 115, 121–22 (3d Cir. 1977), for the proposition that attorneys have an
obligation not to investigate their clients.  Greenberg Br. at 67–68.  This argument, for the
reasons explained above, is unpersuasive.  The Government can punish attorneys' knowingly
false statements made to the Government.  The dicta that Greenberg quotes from *Wilcox* is not
binding and, in any event, distinct from this circumstance, stating that if an attorney "were in fact
to discuss with the Trial Judge his belief that his client intended to perjure himself, without
possessing a firm factual basis for that belief, he would be violating the duty imposed upon him
as defense counsel."  555 F.2d at 121–22.

### 1.  Applicable facts

In the portion of the recording of the post-arrest statement that Greenberg quotes in her

brief, Deboer stated:

> So, I want to be transparent with you, Julia.  I want your cooperation.  I am not going to
> sweet talk to you or anything.  I am going to tell you a lot of stuff that I learned, . . . I
> could dice this around.  I could give you statutes, I could give you max and min, it is not
> worth it, if you know this game.  How long have you been an attorney?  15 years.  I know
> you were born in Belarus, I know you came over here and you started Zontlaw.  So I
> want you to think of your future with your kids, with your husband, and you are maybe in
> the position to help yourself.  What does that mean?  Basically, there are other people in
> this conspiracy that you will be able to provide information on, and you can talk–we are
> not even out of the area here.  People that have a lot less than you and I know you have a
> lot of info on them, from what I have seen.  We will just take it from there.

Recording at 2:04–3:20.

Deboer then administered the *Miranda* warning and Greenberg waived her rights both

orally and in writing.  Greenberg Br. at 18, Gov't Br. at 50.  At this point, and throughout the

interview, Greenberg appears to understand the warnings, to be alert, and to be responsive to

questions.  After Greenberg waived *Miranda*, Deboer showed Greenberg the warrant and the

indictment and read the charges against her, which Greenberg said she understood.  Recording at

6:50–7:16.  Greenberg then proceeded, over the course of the remaining two-hour interrogation

on the drive to Denver, to make potentially inculpatory statements, including that she knew

Mosha filled out the Form I-589 for clients and that she knew CS-1 and CS-3 did not have

truthful asylum claims.  During this time, Deboer and the driver offered to adjust the temperature

for Greenberg and offered her food and water.

### 2.  Applicable law

When an individual is subject to a custodial interrogation, as Greenberg was here, the

accused individual must be advised of her rights in the form of a *Miranda* warning.  *See*

*Thompson v. Keohane*, 516 U.S. 99, 102 (1995).  "If a suspect invokes his *Miranda* rights, . . .

50

'interrogation must stop and the invocation must be scrupulously honored." *United States v. Gomez*, No. 17-CR-602 (JMF), 2018 WL 501607, at *1 (S.D.N.Y. Jan. 19, 2018) (quoting *United States v. Gonzalez*, 764 F.3d 159, 165 (2d Cir. 2014)).  To prove a valid waiver of *Miranda*, "the government must show (1) that relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *Arevalo v. Artus*, 104 F. Supp. 3d 257, 268–69 (E.D.N.Y. 2015) (quoting *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995)).

"Even where an accused has waived his *Miranda* rights, due process prohibits the prosecution from using (at least in its case in chief) statements not made voluntarily to law enforcement.  A statement is involuntary if it is obtained 'under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will.'" *Gomez*, 2018 WL 501607, at *2 (citation omitted) (quoting *Oregon v. Elstad*, 470 U.S. 298, 304 (1985)).  Whether waiver or statements made subsequent to waiver were voluntary depends on a totality-of-the-circumstances analysis, which generally includes "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (quoting *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988)).  Specifically, courts consider "the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, and any use of physical punishment." *United States v. Siddiqui*, 699 F.3d 690, 707 (2d Cir. 2012) (quoting *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989)).  "Compliance with the dictates of *Miranda* is, as discussed, not dispositive—but it is a significant factor weighing in favor of a finding of voluntariness." *Gomez*, 2018 WL 501607, at *2 (citing *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)).

### 3.  Analysis

The Court denies Greenberg's motion to suppress the post-arrest statements.  *First*, motions to suppress evidence must be "accompanied by affidavits describing the facts giving rise to a claim of inadmissibility"; generally, "an attorney's affidavit is insufficient for this purpose." *United States v. Santiago*, 174 F. Supp. 2d 16, 26 (S.D.N.Y. 2001) (citing *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967)); *see also United States v. Ray*, 541 F. Supp. 3d 355, 379–80 (S.D.N.Y. 2021) (explaining that on a motion to suppress, the defendant's "burden ordinarily is carried by the submission of sworn declarations").  That "affidavit must contain allegations that are 'definite, specific, detailed and nonconjectural.'"  *Cobb*, 544 F. Supp. 3d at 339 (quoting *United States v. Longo*, 70 F. Supp. 2d 225, 248 (W.D.N.Y. 1999)).  Greenberg's failure to submit a sworn affidavit is a sufficient basis to deny her motion to suppress.  *United States v. Rodriguez*, No. S2 03-CR-1122 (DC), 2004 WL 2049235, at *2–3 (S.D.N.Y. Sept. 13, 2004) (Chin, J.) (denying the defendant's motion to suppress post-arrest statements allegedly obtained in violation of *Miranda* because the defendant "failed to submit a sworn affidavit").

*Second*, even if the Court considered the merits, it would deny Greenberg's motion to suppress because Deboer properly advised Greenberg of her *Miranda* rights and Greenberg expressed an intent to waive those rights both orally and in writing.  The Court finds that waiver and her subsequent statements were made voluntarily.  First, there is no dispute that Deboer advised Greenberg of her *Miranda* rights, which "in and of itself, is highly probative of voluntariness."  *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 528 (S.D.N.Y. 2015) (citing *Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004)).  Second, Greenberg is a highly educated and mature adult who has practiced as a licensed attorney for 15 years.  *Cf. Siddiqui*, 699 F.3d at 707 (finding a statement voluntary where the accused was "highly educated, having earned her

undergraduate degree from Massachusetts Institute of Technology and a doctorate from Brandeis University"). In fact, when Deboer initially struggled to find her written copy of the *Miranda* warnings to read, Greenberg began to recite the warnings out loud from memory. Recording at 4:00–4:04. Third, in expressing her waiver and throughout the interview, Greenberg spoke and "answer[ed] questions articulately and intelligently." *Ray*, 537 F. Supp. 3d at 581; *see also Gomez*, 2018 WL 501607, at *2 (finding that in a recorded confession, the defendant showed "no visible signs of distress or lack of understanding" and that "his demeanor, tone of voice, and coherent answers to the agents' questions" all supported voluntariness). Fourth, Deboer behaved in a professional manner throughout and offered Greenberg accommodations such as adjusting the temperature in the vehicle and food, both of which Greenberg declined. *Gomez*, 2018 WL 501607, at *2. And finally, the interview, which spanned just over two hours and ended when Greenberg arrived in Denver, was not so long as to be coercive. *E.g.*, *id.* (interview "just under three hours"); *Ray*, 537 F. Supp. 3d at 581 ("interview lasted one hour and a half").

Greenberg's claim of involuntariness rests almost entirely on the brief remarks that Deboer made before Greenberg effectuated her waiver, namely her statement that Greenberg should "think of [her] future with [her] kids, with [her] husband," which Greenberg claims was both coercive and deceptive. Greenberg Br. at 71 (citing, e.g., *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (finding a statement involuntary because it was made "made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'")). The Court cannot agree with this characterization of Deboer's statement. Deboer mentioned Greenberg's family only once and did so to truthfully identify a potential benefit to Greenberg should she choose to cooperate. The statement is not reasonably understood as a threat to seize Greenberg's children or to ensure that she will never

see them again.  An interrogating officer is permitted to mention that charges carry serious consequences and to explain that cooperation could have benefits.  *See United States v. Bye*, 919 F.2d 6, 9–10 (2d Cir. 1990) (collecting cases); *United States v. Corbett*, 750 F.3d 245, 253 (2d Cir. 2014).  Nor is it accurate to say that Deboer "conveniently hid from Greenberg[] the statutory maximum sentence."  Greenberg Br. at 71.  Before reading Greenberg her *Miranda* rights, Deboer offered to provide Greenberg the particular statutes charged and the maximum and minimum sentence associated with each, but Greenberg audibly declined.  And after Greenberg waived her *Miranda* rights, she was shown the arrest warrant and the indictment against her.  Once she was fully appraised of the charges against her, Greenberg could have invoked her right to remain silent, but she did not.  The Court therefore finds, accounting for the totality of the circumstances, that her subsequent statements were voluntary.

Accordingly, Greenberg's motion to suppress her post-arrest statements is denied.

### F.  Grand jury proceedings

Last, Greenberg request the minutes of the grand jury proceedings to further support her motion to dismiss the indictment.  Greenberg Br. at 74. The Court denies this request.

Under Federal Rule of Criminal Procedure 6, grand jury minutes are to be kept secret. Fed. R. Crim. P. 6(e)(2).  That presumption of secrecy can be overcome under limited circumstances.  *E.g.*, Fed. R. Crim. P. 6(e)(3)(E)(ii) (permitting disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury").  But "[t]he party seeking disclosure must show a particularized need that outweighs the need for secrecy."  *In re United States for Material Witness Warrant*, 436 F. Supp. 3d 768, 770 (S.D.N.Y. 2020) (quoting *United States v. Ulbricht*, 858 F.3d 71, 107 (2d Cir. 2017)).  Because of the significant interests advanced by grand jury secrecy, this is a

relatively demanding standard to satisfy, and one reserved to the Court's discretion. *See Ulbricht*, 858 F.3d at 106–07 (citing *In re Grand Jury Subpoena*, 103 F.3d 234, 237 (2d Cir. 1996)).

Greenberg's sole argument for why this demanding standard is satisfied is that because "no evidence exists of Greenberg's participation in the conspiracy alleged in the indictment, the only possible explanation as to why the Grand Jury found probable cause to indict Greenberg was that either [the] Government's witnesses provided perjured testimony or that the Government misstated the law to the jurors on the essential elements of conspiracy." Greenberg Br. at 74. As the foregoing Opinion demonstrates, the Court disagrees with this characterization of the record presented. Greenberg may well have a meritorious argument that there is insufficient evidence to prove her guilt beyond a reasonable doubt. But that argument must be directed to the jury at trial and, at the appropriate time, to the Court in a Rule 29 motion.

The Court concludes that Greenberg has not made a showing of particularized need for the grand jury minutes that would outweigh the interests in secrecy. Her request is therefore denied.

**IV.    Conclusion**

For the foregoing reasons, the Court DENIES Greenberg's motion. This resolves docket number 114.

The Court in a prior order set a pretrial schedule. Dkt. No. 90. Pursuant to that order, a final pretrial conference is scheduled for June 6, 2022, at 2:00 p.m. in Courtroom 906 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, New York. Further, any Rule 404(b) motions and motions in limine shall be filed by May 4, 2022.

SO ORDERED.

Dated: March 9, 2022
        New York, New York

_____
ALISON J. NATHAN
United States District Judge